IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SEAN M. LYONS-PRICE,

        Plaintiff,

        v.                                Civil Action No. 3:05-CV-94

LINDA S. McMAHON,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.    Background

    Plaintiff, Sean M. Lyons-Price, (Claimant), filed his Complaint on August 31, 2005, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Acting Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on October 2, 2006.[2]   Claimant filed his Statement of Errors on November 27, 2006.[3]  Commissioner filed her Motion for Summary Judgment on January 25, 2007.[4]

B.    The Pleadings

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 21.

[4] Docket No. 25.

1. <u>Claimant's Statement of Errors</u>.[5]

2. <u>Commissioner's Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ mis-interpreted the opinion of Claimant's physician, Dr. Singh, and placed controlling weight on that mistaken interpretation.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.


## II.  Facts

A.    <u>Procedural History</u>

Claimant filed his application for Disability Insurance Benefits and Supplemental Security Income on January 30, 2002, alleging disability since July 1, 1993.[6]  The claim was denied initially and on reconsideration.  Claimant filed an untimely request for review by an

---

[5] The Court construes this as a motion for summary judgment.

[6] The ALJ stated in his opinion that Claimant applied for Disability Insurance Benefits and Supplemental Security Income.  (Tr. 24).  Yet Commissioner asserts the record shows Claimant only applied for Supplemental Security Income.  Def.'s Br. at 2 n. 2.  Commissioner asks the Court to consider only Claimant's application for Supplemental Security Income.  Def.'s Br. at 3 n.2.  The record supports Commissioner's claim that Claimant only applied for Supplemental Security Income.  (Tr. 75, 99, 179).  However, this Court may not affirm the ALJ on different legal grounds.  <u>Preston v. Heckler</u>, 769 F.2d 988, 990 (4th Cir. 1985).  Ignoring the ALJ's opinion to the extent it concerns Disability Insurance Benefits would be doing precisely that.  Therefore, the Court must evaluate the case under the assumption Claimant applied for Disability Insurance Benefits.

ALJ, but the untimeliness was excused and Claimant received a hearing before an ALJ on October 2, 2003. The ALJ issued a decision adverse to Claimant on March 16, 2004. Claimant requested review by the Appeals Council, but it denied this request. This case was timely filed and proceeded as set forth above.

B.    Personal History

Claimant was 27 years old on the date of the October 2, 2003 hearing before the ALJ. Claimant has a limited college education. Claimant has prior relevant work experience as a cleaner, produce stocker, and pizza delivery person.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: July 1, 1993 – March 16, 2004.[7]

**Wayne Haley, L.M.F.T., A.C.S.W. and William F. Schultheis, D.O., 3/28/95, Tr. 182**
Diagnosis:
Axis I: major depressive disorder, recurrent, in partial remission, polysubstance dependence
Axis II: personality disorder
Axis III: healing wrist lacerations
Axis V: GAF: 60

**Kerrville State Hospital, 3/8/95, Tr. 183**
The patient has symptoms consistent with adjustment disorder and depressed mood. There is

---

[7] The ALJ's opinion states Claimant previously applied for benefits in 1995, but the application was denied. If true, any decision on benefits prior to that time would be res judicata. 42 U.S.C. § 405(g) (allowing judicial review of decisions of Commissioner within sixty days after the final administrative decision); 42 U.S.C. § 405(h) (providing that decisions of Commissioner made after a hearing are binding); McGowen v. Harris, 666 F.2d 60, 65 (4th Cir. 1981) (stating that "the Secretary [has the power] to deny any social security claim on the basis that it has earlier been denied on the merits by a final administrative decision, i.e., to apply administrative res judicata in bar"). Yet neither of the parties mentions this previous decision in their briefs. The Court has also been unable to locate any documents regarding this previous application in the record. Therefore, like the parties, the Court will regard the relevant date as July 1, 1993.

also a history of alcohol and drug abuse. There is a possible diagnosis of dysthymic disorder. There are other possible diagnoses of anti-social personality disoder and borderline personality disorder.

**Karen Ritchie, M.D., 3/10/95, Tr. 187**
Presumptive diagnoses:
Axis I: major depressive disorder, recurrent, in partial remission, polysubstance abuse
Axis II: personality disorder
Axis III: healing wrist lacerations

**Debra Epps, M.D. and Karen Ritchie, M.D., 3/9/95, Tr. 190**
Presumptive diagnoses:
Axis I: polysubstance dependence, adjustment disorder with depressed mood
Axis III: asthma, by history

**Roy Vellanki, M.D., 5/2/01, Tr. 231**
Admission diagnosis:
Axis I: bipolar disorder, type II
Axis II: antisocial personality disorder
Axis III: obesity, laceration of the wrists
Axis IV: incarcerated
Axis V: GAF: 20, highest 00.

Discharge diagnosis:
Axis I: bipolar disorder, mixed type, severe
Axis II: antisocial personality disorder
Axis III: obesity, laceration of the wrist, sebaceous cyst of the scrotum
Axis IV: incarcerated
Axis V: GAF: 45, admission 20

Prognosis: Poor due to history of antisocial personality disorder, numerous incarcerations, need for inpatient stabilization for treatment of his condition

**Psychiatric Review Technique, 8/7/02, Tr. 251**
There is insufficient evidence for an evaluation.

**Mental Residual Functional Capacity Assessment, 12/7/02, Tr. 268**
Understanding and memory
        The ability to remember locations and work-like procedures, the ability to understand and remember very short and simple instructions, the ability to understand and remember detailed instructions: not significantly limited

Sustained concentration and persistence
        The ability to carry out very short and simple instructions, the ability to carry out detailed

instructions, the ability to maintain attention for extended periods, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, the ability to make simple work related decisions: not significantly limited

The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

Social interaction

The ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

The ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: moderately limited

The ability to interact appropriately with the general public: markedly limited

Adaptation

The ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places or use public transportation, the ability to set realistic goals or make plans independently of others: not significantly limited

The ability to respond appropriately to changes in the work setting: moderately limited

Understanding/memory: the claimant would be able to understand both short and detailed instructions and could remember work locations and procedures. The claimant demonstrates no significant cognitive limitations

Concentration/persistence: the claimant would be able to carry out both short and detailed instructions. However, the pace of the claimant's activities may be somewhat slow due to the claimant's symptoms of depression and anxiety. The claimant could complete a normal work day without an unreasonable number of rest periods. The claimant makes simple meals, does dishes, and performs other household chores independently.

Social: the claimant would have some difficulty relating adequately to coworkers and supervisors and would be unable to relate to the general public given his depression, anxiety, and antisocial personality features. These would lead to some interpersonal withdrawal and conflict. The claimant does interact with girlfriend and grandparents. He would function best in a non-public work environment.

Adaptation: the claimant could make plans, travel independently, and is aware of the hazards in their environment. The claimant is able to perform several chores and activities independently. Given the claimant's depression and anxiety, the claimant may have some difficulty adjusting to changes in routine, but could tolerate the stress involved in everyday work activity.

**Psychiatric Review Technique, 12/7/02, Tr. 271**
Categories upon which the medical disposition is based:
>    12.04 Affective disorders
>    12.06 Anxiety-related disorders
>    12.08 Personality disorders

12.04: The claimant has bipolar disorder, mixed per AP
12.06: The claimant has anxiety disorder, NOS
12.08: The claimant has anti-social features

Functional limitation
>    Restriction of activities of daily living: mild
>    Difficulties in maintaining social functioning: moderate
>    Difficulties in maintaining concentration, persistence, or pace: moderate
>    Repeated episodes of decompensation, each of extended duration: none

The evidence does not establish the presence of the "C" criteria.

**Jefferson Behavioral Health System, 7/11/02, Tr. 291**
Axis I: bipolar I disorder, most recent episode mixed, severe without psychotic features, alcohol dependence in early full remission, (illegible), anxiety disorder NOS
Axis II: R/O borderline personality disorder, antisocial personality disorder

Prognosis: good

**Jefferson Behavioral Health System, 12/12/01, Tr. 294**
Diagnosis:
Axis I: bi-polar I disorder, most recent episode mixed, severe without psychotic features, anxiety disorder NOS, alcohol dependence, early full remission in a controlled environment.
Axis II: antisocial P.D., R/O borderline P.D.
Axis III: none
Axis IV: legal

GAF score (current): 52
GAF score (past year): 58

**Philip Taylor, M.S., Ed., L.P.C. and S.K. Singh, M.D., 8/13/03, Tr. 344**
Diagnosis: bipolar I disorder, most recent episode mixed, severe without psychotic features, panic disorder with agoraphobia, alcohol dependence, sustained full remission, anti-social personality disorder, obsessive-compulsive personality disorder

**David Bousquet, M.Ed., 10/13/03, Tr. 348**
Diagnosis:
Axis I: bipolar I disorder, most recent episode mixed, social phobia, generalized

Axis II: anti-social personality disorder with borderline, dependent and avoidant features
Axis IV: psychosocial and environmental problems: unemployment, inadequate finances, tendencies to isolate and withdraw, inadequate social supports
Axis V: GAF: 40

**Medical Source Statement of Ability to Do Work-Related Activities (Mental), 10/3/03, Tr. 358**
Is the ability to understand, remember, and carry out instructions affected by the impairment? Yes. The individual has the following restrictions:
      Understand and remember short, simple instructions, carry out short, simple instructions: none
      Understand and remember detailed instructions, carry out detailed instructions: slight
      The ability to make judgments on simple work-related decisions: moderate

Is the ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment? Yes. The individual has the following limitations:
      Interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, respond appropriately to changes in a routine work setting: marked

Are any other capabilities affected by the impairment? Yes.
      Capability: anger management.

D.    <u>Testimonial Evidence</u>

    Testimony was taken at the October 2, 2003 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

    Q    I noticed in the report here in Exhibit 15-E, you're asked about your daily

activities, and you say here that you used to work out. Does that mean you don't work out

anymore?

    A    Correct.

    Q    Two or three hours a day you used to?

    A    Right.

    Q    And you also say go out with friends. You used to do that?

A      Right.

Q      You don't do that anymore?

A      No.

Q      You also say you used to work steady hours.

A      Right.

Q      That's not true though, is it?

A      Well, at the jobs I had.

Q      But you only worked for like a couple of months in your whole life?

A      (No audible response.)

Q      Is that right?

A      Right.  During those jobs though, I was working full shifts.

Q      Oh.  Do you still write?

A      No.

Q      You stopped your creative writing?

A      Yes.

Q      When did you stop that?

A      I stopped that a few years ago actually.  About two years ago.

Q      Oh.  So that would have been about 2001 then?

A      Right.

Q      And why did you stop then?

A      I just can't sit down and do it.  I can't focus on a - - on anything, what I write.

*        *        *

Q      And in terms of anxiety.  You have a problem being around groups of people?

A      Yes.

Q      What happens?

A      I get nervous because I'm afraid that I'm going to be irritated or angered by somebody and then react violently.

Q      And you have reacted violently?

A      Yes.

Q      In the past?

A      Yes.

Q      Has that been recently?

A      There's been a few times recently.

Q      In the past few months?

A      Yes.

Q      Could you give me an example?

A      I decided to try to go out and walk to the library with Celia.  And we got - - in Brillion - - and we got almost all the way to the library and there was two or three people on the sidewalk.  One of them kind of brushed by me, and I turned around and hit him because I thought he did it.  I mean, it just seemed like he did it on purpose.  Like he was trying to get me to do it.

Q      Do the two of you go to the library often?

A      No.

Q      You're - - were you accompanying her or was she going with you?

A        She goes a lot.  I was just trying to go to get out.  I wanted to try it one time.

Q        Do you do any reading?

A        No.  I, I can't, I can't focus on a book or a magazine.

Q        But she does the reading?

A        Yes.

                          *                    *                    *

Q        And I noticed you helped move your mother back in January.  Is that right?

A        Yes.

Q        She was moving to another location?

A        Right.

Q        Do you have any physical problems?

A        No.

                          *                    *                    *

Q        And it says here that you, you go walking after dark?

A        Sometimes.

Q        Is it because you want to avoid people?

A        Yes.

                          *                    *                    *

Q        And you don't - - you're not able to read anymore either.

A        No.

Q        Now, you say you stopped writing a couple of years ago.  When did you stop

reading?

A       About the same time.

Q       In 2001?

A       Yeah.  That's about right.

Q       And is that because of your concentration?  You can't concentrate?

A       Right.

Q       Well, what - - how do you spend your time?  What time do you get up and what do you generally do?

A       The time I get up varies.  Sometimes I get up early in the morning and I really don't do anything.  I, I try to do stuff.

Q       Do you make breakfast?

A       No.

Q       Do you make your own lunch?

A       No.

Q       Oh, does Celia do that?

A       Yes.

Q       Oh.  And how do you spend the rest of the day then?

A       Just sitting around.

Q       Do you get out to movies, sports events?

A       No, I don't - - no.

Q       Church?

A       No.

Q       And you've had a problem with substance abuse in the past?

Q      Right.

Q      Or alcohol and drugs?

A      In - - yeah.  In the past.

Q      When did you stop those things?

A      I stopped those a long time ago.  That's been - - let's see - - I've been clean for a good five, seven years.

Q      Alcohol too?

A      Yeah.

Q      Do you sometimes drink?

A      Every time - - no.

Q      And do you think that you could handle any job at this time?

A      No.

Q      Is that primarily because of your temper?

A      Yes.

                    *            *            *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q      Tell the Judge, when is the last time from this morning, that you slept?

A      I woke up Tuesday morning.

Q      And you've been awake since that?

A      Yes.

Q      And do you have periods where you will be awake for several days?

A      Yes.

Q      How often do they occur?

A      About once a month.

Q      And what's the longest period you will be awake?

A      An average of four days.

Q      And do that - - during that four days does your - - do you become more irritable and short tempered as those days pass?

A      Yes.

Q      And during that time, is it referred to around your house, by Celia, as the time when things get broken?

A      Yes.

Q      And has anything got broken so far this week?

A      Not this week.

Q      All right.  And when you were telling the Judge about your physical confrontations with the, with the, with your supervisors.  Did you associate with your coworkers on any of the jobs that you had, especially the industrial mill service job, the laborers job you had?

A      No.

Q      During the breaks would  you sit down and walk with them?

A      No.

Q      Why not?

A      They would always joke around and make comments about each other, and I just didn't like it because I thought they were directed at me, you know, negatively.

Q     If, if you were to have a job where you could be lone.  Let's say you had a job where all you're have to do is sit and monitor some alarms that I'm - - they work in various manners.  But let's say the most simple were, there would be a dial that would be green.  And if an alarm went off, it would just change to red.  And all you would have to do is pick up a phone.  You wouldn't have to dial the phone.  And tell them, whoever is on the other way, such a such alarm has been tripped.  And you know, you would be all by yourself in a room, you know.  Not anybody around.  Now, you couldn't sleep.  Okay.  But matter - - but you'd have to give that - - those, the alarm, the alarm indicators maybe not 100 percent of your attention.  But you would have to give it most of your attention.  You wouldn't be able to read.  You would be able to eat and drink.  But that would, that would be about it.  Could you do that job?

A     No.

Q     Why not?

A     I wouldn't, I wouldn't be able to concentrate on the job, on the dials.

Q     Well, if it's an eight hour job, would that have any effect on your emotional stability as the eight hours passed.

A     Become more and more agitated.

Q     Okay.  And you would be able to take bathroom breaks. I don't want you to think that you - - you know.  You have to take bathroom breaks and you know, you'd probably be able to take a 15 minute break in the morning at the beginning of the hours.  Maybe a half hour for lunch in the middle, and 15 in the afternoon.  All right.  Assuming that would.  Would you still continue to - - the escalating agitation as the day went by?

A     Yes.

Q       All right.  And what would your temper be when you left that room?  What would your agitation level and - - when you said agitation, does that have any effect on your temper when you get agitated?

A       Yes.  I become angry at anything.

Q       Right.  So would it be fair to say that you'd be angry when you left there.  Right?

A       Yes.  Very.

Q       Right.  And I guess it would you know - - but if you ran into somebody like the guy who brushed you.  Do you think you would react the same way or - -

A       More so.

Q       Now, were you particularly agitated the night that that happened, that you told the Judge where the guy brushed you and you turned around and punched him?

A       (No audible response.)

Q       Before that happened, were you particularly agitated?

A       No.

Q       All right.  So it was just like a normal day for you?

A       Right.

                              *              *              *

Q       Do you sleep through the night?

A       Not - -

Q       With the 1500 - -

A       No.

Q       No.  How long do you sleep at a time?

A       It varies.  On an average?

Q       No.  You can just give us the shortest, the longest, you know?

A       Oh, 30 minutes to an hour.

Q       All right.  Do some nights, maybe two hours?

A       Some.

Q       Okay.

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q       How long has this been true that you haven't been able to sleep?

A       Two or three years.

*                    *                    *

RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Well, the Judge covered the creative, the creating writing.  But in, in 2003, there's an, there's an - - in your Jefferson Behavioral records there's a note that you may have created - - that gives the indication that you have posted some creative writing on the internet.  And the impression I got when I read it was that it was something you had just written.  Have you posted any creative writing on the internet within the last six months?

A       Yes.

Q       All right.  And was it some new writing of yours?

A       No.

Q       How old was it?

A       Years.  Three, four years old.

ALJ         Do you have a computer at home?

CLMT        Yes.  Celia's.

ALJ         Do you get on the internet every day?

CLMT        No.

ALJ         How often would you say?

CLMT        Once a week.

ALJ         Do you surf the net or send e-mail or both?

CLMT        I contact my family through e-mail.  My parents.

ALJ         Okay.  Mr. Shaffer.

CLMT        That's it.

BY ATTORNEY:

Q        You contact just your parents?

A        Yes.

Q        And do you have intrusive thoughts?  The thoughts that come into your mind that you don't want, but you get them?

A        Yes.

Q        And do you have any control over it whatsoever?

A        No.

Q        When you get those thoughts, can you think about anything else?

A        No.

Q        If you were doing something when those thoughts come into your mind, what do you do?

A        I just think about them.  I, I have to.

Q    And the job I talked to you about earlier.  Would that - - would you be more likely to get those intrusive thoughts in a situation like that, than you would be in a, in a - - like say at home?

A    Yes.

Q    Now, when those thoughts come in.  If I understood you correctly.  You just cannot think about anything else.

A    Right.

Q    Right.   Now, you don't drive.  Is that correct?

A    Correct.

Q    Suppose you were on a - - well, we don't - - can you take - - given what you'd said, I assume you also do not use public transportation?

A    No.

Q    How long will those intrusive thoughts stay?  And basically, would it be fair to say, if it's not, if it's not correct, and you must tell us, that you basically are - - those thoughts while they don't incapacitate you physically, they incapacitate you mentally.  And you're able not to do anything else but sit and think about them?

A    That's right.

Q    And how long does that last?  I realize it doesn't always last the same amount of time.  Nothing is exactly the same, with a machine.

A    It, it plays like a movie, so I can't stop thinking about it until I go all the say through it.  So I have to play it out in my head until the end, to get to the end results.  So it can be a full day.  It's lasted a full day.

Q       All right.  And what is your emotional state once those intrusive thoughts have finally played themselves out?

A       I feel really, really angry. They shouldn't be there.

Q       All right.  Are you angry at yourself?

A       Yes.

Q       Doing damages to yourself.  You don't take that out on other people, do you?

A       Yes.

Q       Okay.  Or things?

A       Yes.

Q       And you prefer things.  To do it with things other than people.

A       Whatever is there.

Q       Okay.  Do you leave the home, do you leave your home only at - - usually at - - the Judge asked you about your going walking at night.  Is there any other time that you would leave the home by yourself?

A       No.

Q       Now, when you are home alone, do you use a stove as far as cooking?

A       No.  No.

Q       Why is that?

A       I forget that there's something on it.

Q       But you will cook a microwave meal, I guess?

A       Yes.

Q       And I don't want to offend you, but when you went for your intake was at the

Social Security Office.  There was a note made by the person who did the intake, that I really don't want to offend you.  But that there, that there was a strong body odor.  Do you have problems taking care of your personal hygiene on a regular basis?

A        Sometimes I forget.

Q        Okay.  How often when you say sometimes.  How long do you forget for?  How many days - - well, like if you forget today, you'll remember tomorrow or - -

A        No.  It's two, three days at a time.

Q        And what reminds you to do it?

A        Celia.

Q        All right.  And does that - - and, and do you at least change clothes or anything during that period of time?

A        No.

Q        You indicated that the meds make you sleepy.  Do you have to take naps during the day?

A        Yes.

Q        All right.  On - - when you wake up during the night, you said you wake up every 30 minutes to an hour, maybe sometimes two hours.  How long are you awake during those times?

A        For 45 minutes to an hour.

Q        All right.  And do you, when you get up, when you wake up, do you feel groggy from the medication you've taken?

A        Yes.

Q       All right.  And when you take these naps, am I - - you basically take your Zoloft when you get up, which is between 9:00 and 10:00.  When do you fall asleep?  When do you have to take these naps?   Now, wait, before you answer.  Do you take these naps because you're bored or, or because you're just very - - so sleepy, you can't stay awake?

A       Just if I'm tired.  I can't - -

Q       Right.  All right.  And about what time of the day would that occur, roughly?

A       At 2:00 to 3:00.

Q       All right.  And how long do you sleep?

A       A few hours.

Q       All right.  So you sleep better during the day than you do at night?

A       Yes.

ATTY        I haven't anything further, Judge.

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q       And you don't drive a car?

A       No.

Q       Do you have a driver's license?

A       No.

Q       Did you ever have one?

A       I did.

Q       And what happened?

A       I just let it lapse because I can't drive.

Q     It wasn't a DUI?

A     No.

Q     And do you ever go to church?

A     No.

Q     And you no longer belong to the Satanic cult?

A     No.

Q     Okay.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

A     The claimant worked as a produce stocker for about a month.  That would be considered light and unskilled.  Also for about a month he worked as a pizza delivery person. That would be light and semiskilled.  And then finally for one week, the claimant worked as a cleaner.  That would be light and unskilled.

Q     Okay.  I'd like to pose a hypothetical, also concerning claimant's age, education level and work experience.  Let's assume this individual should avoid interaction with the general public, avoid intensive supervision, avoid interaction with coworkers or close proximity to coworkers.  And avoid changes in the work setting.  Would that allow performance of past work or other work?

A     It would allow performance of the cleaner work, Your Honor, and other work as well in the national economy.

Q     Okay.  Let me add hypothetical - - well, what, what other jobs would be appropriate?

A        Another job would be laundry worker at the light exertional level, 650 locally, 75,000 nationally.  And a third example would be night watchman.  Those would number about 800 locally and about, about 80,000 nationally.

Q        Now, let's also assume this individual should avoid changes in the schedule, work schedule or work environment.  Would that change your testimony?

A        No, Your Honor.

Q        This individual also were forced to miss a day of work a week, because of problems leaving the house.  Would that affect your testimony?

A        Yes, Your Honor.  That would preclude all substantial gainful activity.

Q        Okay.

ALJ        Mr. Shaffer.

ATTY        Normally I do not do this.  But this - -

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        If the person, if this person would not be able to travel alone to the work site.  And taking off the Judge's last day for work, but that the person would not be able to travel alone to the work site.  And would require at least for the first two weeks of a, of a new employment that someone he knows be there with him?

ALJ        Well, I think the traveling is irrelevant.  But - -

ATTY        Oh.

ALJ        - - the - - having somebody else there with him - -

VE        That would only be supported employment.  So it would not be competitive employment.

       \*       \*       \*

E.      <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Lives with his fiancee in an apartment (Tr. 46)

- Attends to his own personal care (Tr. 131)

- Prepares sandwiches and soups (Tr. 131)

- Performs chores such as washing dishes, making the bed, and vacuuming (Tr. 132)

- Reads as a hobby (Tr. 133)

- Shops in stores for clothes (Tr. 141)

- Cooks eggs, spaghetti, and oatmeal (Tr. 176)

- Cooks microwave meals (Tr. 176)

### III. The Motions for Summary Judgment

A.      <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. The specific assignments of error Claimant makes are unclear. Claimant has not numbered his assignments of error or otherwise placed them under distinct headings. His arguments tend to merge together. After examination of Claimant's brief and the entire record, the Court has concluded Claimant has made the following specific arguments. Claimant first objects that the ALJ focused on records indicating Claimant had a poor attitude and lack of motivation.

Claimant argues the ALJ misunderstood the evidence and ignored evidence in his favor. Due to this mis-understanding, the ALJ's opinion lacks substantial evidence insofar as it finds Claimant not disabled under the medical listings. It also lacks substantial evidence in its credibility analysis, its residual functional capacity, and its determination that work exists Claimant can perform. Second, Claimant argues the ALJ erred in giving insufficient weight to the findings of the consultative examiner.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner did not have the benefit of knowing the assignments of error the Court would find from Claimant's confusing brief when Commissioner submitted her brief. Commissioner focuses on how Claimant does not meet the medical listings at the third step of the disability inquiry. Commissioner also argues substantial evidence supports the ALJ's decision to find Claimant lacks motivation to improve his condition.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the

Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

I.

The ALJ's Determination that Claimant Lacks Motivation

Claimant first argues the ALJ erred in reading the record as showing him to lack

motivation to work.  Claimant argues the ALJ ignored relevant evidence in favor of evidence

adverse to Claimant.  Claimant also contends the ALJ mis-interpreted the opinion of Dr. Singh,

Claimant's treating physician.  Due to these errors, Claimant contends the ALJ's determination

that Claimant does not qualify for disability under the medical listings lacks substantial evidence.

Claimant further contends the ALJ's credibility analysis, residual functional capacity, and

determination that Claimant can perform other work also lack substantial evidence.

Commissioner argues substantial evidence supports the ALJ's decision to find Claimant's

limitations stem from a lack of motivation.  The ALJ's findings will be upheld as long as

substantial evidence supports them.  Hays, 907 F.2d at 1456.

The key to the ALJ's decision was the opinion of Claimant's treating physician, Dr.

Singh.  (Tr. 26).  Dr. Singh diagnosed Claimant with bipolar I disorder (severe without psychotic

features), panic disorder with agoraphobia, alcohol dependence in full remission, antisocial

personality disorder, and obsessive-compulsive personality disorder.  (Tr. 345).  In November

2002, Dr. Singh found there was a "Question of motivation" regarding Claimant's abilities in

concentration, persistence, and pace.  (Tr. 265).  It was stated Claimant "Does a fair job of taking

care of himself but resists jobs/assignments given by others."  (Id.).  He further opined that if

Claimant worked in a job involving routine, repetitive tasks, he could "find the work beneath

him and . . . refuse to do it."  (Id.).  Still, Dr. Singh stated Claimant suffered from extreme

difficulty in his ability to adapt to different environments or routines.  (Id.).

The ALJ acknowledged Dr. Singh diagnosed Claimant with several mental impairments, but determined the important point of his opinion that "the claimant, if motivated, could perform at a much higher level than he often exhibits."  (Tr. 26-27).  The ALJ went on to state that "Dr. Singh's assessment of the claimant's ability to perform work activities reveals that the claimant's ability to perform, for example, tasks requiring concentration, persistence and pace, was entirely based on the claimant's motivation."  (Tr. 27).  To the ALJ, "such a finding by the claimant's treating physician establishes that it is not so much any limitations from any discernable mental impairments that form the basis of the mental limitations . . . but the claimant's desire or motivation to work."  (Id.).  The ALJ found Dr. Singh's opinion entitled to "controlling weight." (Tr. 28).

In contending the ALJ mis-interpreted Dr. Singh's opinion, Claimant points to a letter from Dr. Singh to his attorney from August 2004.  In the letter, Dr. Singh indicates he believes Claimant's mental impairments are more responsible for any attitude problems he may have than his attitude problems are responsible for his mental impairments.  (Tr. 360).  The letter from Dr. Singh was written after the ALJ's decision.  (Id.).

A person seeking to present evidence to the Court not put before the ALJ must show that the evidence is new and material, as well as show good cause for the failure to incorporate the evidence at the prior proceeding.  42 U.S.C. § 405(g).  A different situation applies where the evidence was not presented to the ALJ, but was presented to the Appeals Council and was incorporated by the Appeals Council into the record.  Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991).  In that case, the Court should "review the record

as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings."  Id.

In this case, Dr. Singh's letter was presented to the Appeals Council and incorporated by the Appeals Council into the administrative record.  (Tr. 5, 12, 360).  Therefore, the Court should simply review all the evidence, including the letter, to determine whether substantial evidence exists.  Wilkins, 953 F.2d at 96.

Dr. Singh's August 2004 letter to Claimant's counsel regarding how he interprets Claimant's mental impairments directly contradicts the assessment the ALJ gave to Dr. Singh's opinion.  The ALJ determined from the medical records that Dr. Singh believed "the claimant's ability to perform work activities was based upon his motivation."  (Tr. 27).  He stated "Dr. Singh has assessed, in essence, that, if the claimant were so motivated, he could perform at a much higher level that he does perform."  (Tr. 28).  The ALJ gave this interpretation "controlling weight."  (Id.). Dr. Singh disagreed with this assessment.  (Tr. 360).  He stated that while Claimant has issues with his attitude, "that does not discount his mental impairment."  (Id.).  Dr. Singh went on to state that "it is our contention that it is Mr. Price's mental health impairment that causes or contributes to his attitude problem and not vice-versa."  (Id.).  Thus, while the ALJ believed Dr. Singh found Claimant's attitude problems (lack of motivation) contributed to his mental impairment, Dr. Singh in fact determined Claimant's mental impairment caused his attitude problems.

As mentioned above, the ALJ placed significant reliance on his interpretation of Dr. Singh's opinion, which was flawed.  It is Dr. Singh's records which fill the ALJ's opinion when he reviews the medical records before beginning his legal assessment.  (Tr. 26-28).  The ALJ

stated he gave Dr. Singh's opinion "controlling weight." (Tr. 28). Yet the ALJ's interpretation was erroneous.

Given this error, the ALJ's decision that Claimant does not qualify for benefits under the medical listings is not supported by substantial evidence. The error also means the ALJ's residual functional capacity assessment, credibility analysis, and hypothetical question to the Vocational Expert are not supported by substantial evidence. Therefore, this case should be remanded to the ALJ so he may evaluate the evidence with the correct understanding of Dr. Singh's opinion.

## II.

### The ALJ's Consideration of the Consultative Examiner's Opinion

Claimant next argues the ALJ erred in not giving sufficient weight to the opinion of the consultative examiner, Dr. Bousquet. The ALJ's findings will be upheld as long as they have substantial evidence to support them. Hays, 907 F.2d at 1456.

The ALJ noted Dr. Bousquet found Claimant suffered from significant work-related limitations, but declined to credit Dr. Bousquet's opinion. (Tr. 28). The reason for this was that the ALJ found Dr. Bousquet's opinion inconsistent with that of Dr. Singh, who was Claimant's treating physician. (Id.). Yet as noted above, the ALJ erred in his interpretation of Dr. Singh's opinion. On remand, the ALJ should again consider Dr. Bousquet's opinion in light of the proper interpretation of Dr. Singh's opinion.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ mis-interpreted the opinion of Claimant's physician, Dr. Singh, and placed controlling weight on that mistaken interpretation.

2.       Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears pro se and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: February 5, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE